JOSEPH W. COTCHETT (36324)
NIALL P. McCARTHY (160175)
NANCY L. FINEMAN (124870)
MARK C. MOLUMPHY (168009)
KELLY L. BULAWSKY (234025)
**COTCHETT, PITRE, SIMON & McCARTHY**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Phone: (650) 697-6000
Fax: (650) 697-0577
mmolumphy@cpsmlaw.com

TINA BAILER NIEVES (134384)
**GANCEDO & NIEVES, LLP**
144 W. Colorado Boulevard
Pasadena, CA 91105
Phone: (626) 685-9800
Fax: (626) 685-9808
email: tnieves@gancedonieves.com

Attorneys for Plaintiff M.J. Furman,
derivatively on behalf of Wal-Mart Stores, Inc.

E-filing

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

SBA

|  |  |
|---|---|
| M.J. FURMAN, derivatively on behalf of WAL-MART STORES, INC., | Case No. **C 06 3532** |
| Plaintiff, | **COMPLAINT** |
| vs. | **DERIVATIVE CLAIMS FOR:** |
| S. ROBSON WALTON; JIM C. WALTON; JAMES W. BREYER; DAVID D. GLASS; ROLAND A. HERNANDEZ; JOSE H. VILLARREAL; H. LEE SCOTT, JR.; JACK C. SHEWMAKER; and DOES 1-50, inclusive, | 1. BREACH OF FIDUCIARY DUTY; |
|  | 2. ABUSE OF CONTROL; and |
|  | 3. UNJUST ENRICHMENT. |
| Defendants; | **DEMAND FOR JURY** |
| -and- |  |
| WAL-MART STORES, INC., Nominal Defendant. |  |

SHAREHOLDERS' DERIVATIVE COMPLAINT

# **TABLE OF CONTENTS**

          **Page**

I.     NATURE OF THE ACTION     1

II.    JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT    4

III.   PARTIES    4

       Plaintiffs    4

       Nominal Defendant    5

       Director Defendants    5

       Unnamed Participants    8

       Doe Allegations    11

IV.   STATEMENT OF FACTS    11

       Rise of Wal-Mart    11

       Wal-Mart's Discrimination Against Female Employees    12

       Wal-Mart's Pattern and Practice of Willfully Violating Employment Laws    19

       Injury and Damage to Wal-Mart    22

V.    DEMAND REQUIREMENT    25

VI.   CAUSE OF ACTION    32

       Breach of Fiduciary Duty    32

       Abuse of Control    33

       Unjust Enrichment    33

VII.  PRAYER FOR RELIEF    34

VIII. JURY TRIAL DEMAND    34

EXHIBIT A

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

1   Plaintiff M.J. Furman ("Plaintiff"), derivatively on behalf of Wal-Mart Stores, Inc.,
2   alleges the following based upon the investigation of Plaintiff and her counsel, including a
3   review of legal and regulatory filings, press releases and media reports about Wal-Mart.

I.

## NATURE OF THE ACTION

6   1.      This is a shareholders' derivative action brought pursuant to Rule 23.1 of the
7   Federal Rules of Civil Procedure on behalf of Wal-Mart Stores, Inc. ("Wal-Mart" or the
8   "Company") against certain members of its Board of Directors and certain senior officers for
9   breach of fiduciary duty and abuse of control.

10  2.      Wal-Mart is the largest private employer in the United States, and the second
11  largest employer behind the federal government. It is a public company listed on the New York
12  Stock Exchange with approximately 4.1 billion shares of common stock outstanding, held by
13  hundreds of thousands of individual and institutional investors – one of the most widely owned
14  public companies in the world.

15  3.      By this action, plaintiff alleges that Defendants abused their fiduciary and
16  controlling positions at Wal-Mart by their reckless mismanagement of the Company, authorizing
17  and encouraging the systematic violation of federal and state civil rights, employment, and labor
18  laws with respect to the unlawful discrimination of Wal-Mart's female workforce and other
19  unlawful or otherwise improper labor and related practices. This unlawful behavior has severely
20  damaged Wal-Mart, exposing it to the huge costs associated with investigating misconduct,
21  implementing remedial measures, and defending class action suits, and damaging Wal-Mart's
22  business operations, corporate image and goodwill. At the same time, Defendants have been
23  enriched by salaries, bonuses, fees, stock options and other perquisites not justified by Wal-
24  Mart's unlawful activities and performance under their stewardship.

25  4.      Defendants' disregard for their own fiduciary and legal obligations has bred a
26  climate of disdain and disrespect for legal compliance throughout Wal-Mart's managerial and
27  supervisory ranks, resulting in employment class action lawsuits, settlement payments, and large
28  jury verdicts against Wal-Mart. Defendants' disdain for legal compliance has created a

❀
LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

1 discriminatory workplace where Wal-Mart's women employees are harassed and mistreated,
2 resulting in a suit by more than 1.5 million current and former women employees, the largest
3 employment discrimination class action in history. In this Court, *Dukes v. Wal-Mart Stores, Inc.*,
4 has been certified for class action treatment, alleging that Wal-Mart discriminates against its
5 female employees in promotions, compensation and job assignments in violation of Title VII of
6 the Civil Rights Act of 1964. Defendants admit in Wal-Mart's SEC filings that "the Company
7 may be subject to liability or damages that could be material to the Company." In the six trading
8 days after the Court certified the Dukes case as a class action, Wal-Mart stock lost $13.5 billion
9 in market value. Although the class certification decision in *Dukes* is on appeal to the Ninth
10 Circuit Court of Appeals, the Company's ultimate liability in the case is likely to be material.

11      5.     The above legal challenges constitute serious and unnecessary threats to Wal-
12 Mart's finances and future prosperity. Collectively, the lawsuits are already doing severe damage
13 to the company's business operations, public image, goodwill and reputation, as confirmed by
14 internal studies commissioned by the Wal-Mat Board of Directors. Moreover, no other company
15 has as sordid a record of abuse of the U.S. legal system as Wal-Mart. This abuse of the legal
16 system by improper and abusive litigation tactics directed and/or overseen by the Company's
17 Board of Directors has harmed the Company before courts across the nation. Wal-Mart has been
18 repeatedly sanctioned for engaging in discovery abuse and improper litigation tactics and
19 disobeying court orders.

20      6.     Wal-Mart's pattern of discrimination and disregard for legal accountability and
21 compliance has plunged it into crisis. In addition to expensive and threatening litigation, Wal-
22 Mart has been subjected to a widespread and effective public education campaigns, including
23 those by the National Organization for Women, Union Network International ("UNI"), the United
24 Food and Commercial Workers, the Southern Christian Leadership Conference, the Labor
25 Council of Latin American Advancement, the AFL-CIO, and others, to publicize Wal-Mart's
26 unlawful and unfair business, employment and labor practices.

27      7.     Wal-Mart's unlawful practices while under Defendants' stewardship have
28 damaged the Company's public image, reputation and goodwill, exposing it to negative publicity

1 and criticism. Business commentators agree that the consistent drumbeat of adverse media
2 coverage mounding Wal-Mart's treatment of employees, suppliers and customers has hurt Wal-
3 Mart's bottom line in the long term.

4       8.      The effects of Wal-Mart's lawlessness are widely felt. The Domini 400 Social
5 Index, an influential socially responsible investment fund, dropped Wal-Mart from its holdings.
6 *Fortune* followed suit and removed Wal-Mart's name from its list of the "100 Best Companies to
7 Work For" after reviewing formation about unfair employment practices and discrimination
8 against women. Wal-Mart earned the dubious distinction of being named the National
9 Organization for Women's fifth *"Merchant of Shame."*

10       9.      Defendants' actions are harming Wal-Mart's business in other important ways. For
11 instance, public outrage over the way the Wal-Mart Board has caused the Company to conduct its
12 business has resulted in votes by local communities in Inglewood, California and Chicago,
13 Illinois to block the building of Wal-Mart stores, harming Wal-Mart's expansion plans. Many
14 cities, including Oakland, California, have passed legislation preventing Wal-Mart from building
15 "Super Stores" in their communities. Recently, the City Council of Hercules, California voted to
16 take the unprecedented step of using eminent domain to prevent Wal-Mart from building a store
17 on a 17-acre lot near the city's waterfront. During this same period of time, while Wal-Mart's
18 business and reputation have been damaged, Defendants have lined their pockets with excessive
19 and unjustifiable compensation and insider trading proceeds, typically through salaries, bonuses,
20 stock options, directors' fees and other perquisites.

21      10.     The damage to Wal-Mart's business, reputation, image and goodwill as a result of
22 the Defendants' misconduct and mismanagement has caused the stock to be a poor performer,
23 absolutely and relatively. Between 1999 and 2006, Wal-Mart stock has fallen from a high of
24 nearly $70 per share to the mid-$40s – a loss of over $100 billion in market value – and in stark
25 contrast to the market performance of its industry competitors. Investors increasingly shun the
26 stock.

27

28

1    11.    Despite the mounting problems, Defendants have taken no steps to fix them or

2  recover damages for Wal-Mart based on the misconduct and completely ignored plaintiff's

3  repeated demands to bring action.  By this action, plaintiff, a long-time owner of shares of Wal-

4  Mart stock, seeks to recover damages for Wal-Mart against its wayward fiduciaries.

5                                            II.

6              **JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

7    12.    This Court has jurisdiction of this dispute under 28 U.S.C. § 1332 and § 1367.

8  The amount in controversy, exclusive of interest and costs exceeds the jurisdictional minimum of

9  this Court.  Wal-Mart has and will continue to have a significant impact on the economy of

10  California.  Each Defendant has sufficient contacts with California as a director and/or officer of

11  Wal-Mart to make proper the exercise of personal jurisdiction over them.

12    13.    Venue is proper in this Court under 28 U.S.C. § 1391.  A substantial part of the

13  events or omissions giving rise to the claims alleged occurred in this District.  Wal-Mart has a

14  substantial presence in California, operating over 120 Wal-Mart stores, over 20 SAM'S Clubs,

15  seven distribution centers, and Wal-Mart.com, based in California, many of which are located

16  within this District.  Several of Wal-Mart's directors are residents of California.  Intradistrict

17  assignment to the San Francisco Division is appropriate since the action arises in this Division.

18  Related litigation, *Dukes v. Wal-Mart Stores, Inc.,et al.,* Civil Action No. C-01-2252 (MJJ), a

19  class action on behalf of employees of Wal-Mart alleging violations of law as described herein, is

20  pending in this District and this Division..

21                                           III.

22                                      **THE PARTIES**

23  **A.    The Plaintiff**

24    14.    Plaintiff <u>M. J. Furman</u> is the owner of approximately 1,600 shares of

25  Wal-Mart stock.  Plaintiff has owned Wal-Mart shares at all times relevant hereto, and continues

26  to be a Wal-Mart shareholder.  Plaintiff is a citizen of a state that is different from the States of

27  Delaware and Arkansas.

28

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

**B.     The Nominal Defendant**

15.     Nominal defendant Wal-Mart is a Delaware corporation with corporate headquarters in Bentonville, Arkansas. Wal-Mart is named in this Complaint solely as a nominal defendant in its derivative capacity, and this shareholder's derivative action is brought on its behalf. No economic claims are made herein against the Company. Wal-Mart, while formally incorporated in Delaware, has few business operations, assets or employees there. By contrast, Wal-Mart has more stores and operations located in California than in any other state. Wal-Mart operates over 120 stores in California compared to just eight in Delaware. Wal-Mart also owns or leases more property in California than in Delaware, and a large number of its shareholders reside here in California.

**C.     The Director Defendants**

16.     Defendant S. Robson Walton ("Rob Walton") has been Chairman of the Board Directors of Wal-Mart since 1992 and a member of its Executive Committee since the 1980s. Rob Walton and his family control approximately 38% of Wal-Mart's common stock and, at all relevant times, has dominated and controlled the Wal-Mart Board of Directors, as well as the Company's business affairs. Walton and his family have personally selected every member of the Wal-Mart Board Directors. He is neither independent nor disinterested in the wrongdoing alleged, nor in the decision to reject plaintiff's demand to bring suit.

17.     Defendant Jim C. Walton ("Jim Walton") has been a director of Wal-Mart since 2005. Jim Walton and his family control approximately 38% of Wal-Mart's common stock and, at all relevant times, have dominated and controlled the Wal-Mart Board of Directors, as well as the Company business and affairs. Jim Walton and his family have personally selected every member of the Wal-Mart Board of Directors. He is neither independent nor disinterested in the wrongdoing alleged, nor in the decision to reject plaintiff's demand to bring suit.

18.     Defendant James W. Breyer ("Breyer") has been a director of Wal-Mart since 2001 and serves as the Chair of the Strategic Planning and Finance Committee. Breyer was hand-picked to this position by the Waltons and, in exchange for his fidelity, was awarded with hundreds of thousands in fees, compensation, stock and other consideration. Breyer beneficially

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

1  owns more than 10% of Groove Networks, Inc., to which Wal-Mart paid $278,003 for computer
2  software and services in fiscal 2005. He is neither independent nor disinterested in the
3  wrongdoing alleged, nor in the decision to reject plaintiff's demand to bring suit.

4         19.     Defendant Roland A. Hernandez ("Hernandez") has been a director of Wal-Mart
5  since 1998, and is the Chair of the Audit Committee, which is charged, among other things, with
6  the Company's policies and procedures regarding compliance with applicable employment laws
7  and regulations. Hernandez was hand-picked to this position by the Waltons and, in exchange
8  for his fidelity, has been rewarded with millions in fees, compensation, stock and other
9  consideration. In addition, Hernandez has pocketed hundreds of thousands of dollars more
10 through sweetheart related-party transactions with the Company. He is neither independent nor
11 disinterested in the wrongdoing alleged, nor in the decision to reject plaintiff's demand to bring
12 suit.

13        20.     Defendant David D. Glass ("Glass") has been a director of Wal-Mart since 1977
14 and has served as the Chairman of the Executive Committee of the Board since February 2000.
15 Glass also serves on the Stock Option Committee. Glass served as Wal-Mart's President and
16 CEO from January 1988 to January 2000. Glass was hand-picked to these positions by the
17 Waltons and, in exchange for his fidelity, has been awarded with millions in fees, compensation,
18 stock and other consideration. In addition, Glass and his family have pocketed millions more via
19 sweetheart related-party transactions with the Company. He is neither independent nor
20 disinterested in the wrongdoing alleged, nor in the decision to reject plaintiff's demand to bring
21 suit.

22        21.     Defendant H. Lee Scott, Jr. ("Scott") has been President and Chief Executive
23 Officer of Wal-Mart since January 2000 and a director of Wal-Mart since 1999, where he Chairs
24 the Stock Option Committee and also serves on the Executive Committee with Rob Walton and
25 Glass. Scott also held other positions with Wal-Mart since jointing the Company in September
26 1979, including Vice Chairman and Chief Operating Officer, from January 1999 to January 2000,
27 and Executive Vice President and President and CEO, Wal-Mart Stores Division, from January
28 1998 to January 1999. Scott was hand-picked to these positions by the Waltons and, in exchange

1  for his fidelity, has been rewarded with millions in compensation and other payments from the

2  Company over the past several years. In 2004 alone, Scott reportedly pocketed more than $17.5

3  million in excessive compensation, or nearly twice the average of $9.6 million for leading CEOs,

4  according to *Business Week.* Scott raked in approximately $8,434 per hour in 2004, or 871 times

5  more than the average Wal-Mart worker. He is neither independent nor disinterested in the

6  wrongdoing alleged, nor in the decision to reject plaintiff's demand to bring suit.

7      22.     Defendant Jack C. Shewmaker ("Shewmaker") is a former Wal-Mart executive

8  and has been a director of Wal-Mart since 1977, where he serves on the Strategic Planning and

9  Finance Committee. Shewmaker was hand-picked to this position by the Waltons and, in

10  exchange for his fidelity, has been rewarded with millions in fees, compensation, stock and other

11  consideration. He is neither independent nor disinterested in the wrongdoing alleged, nor in the

12  decision to reject plaintiff's demand to bring suit.

13      23.     Defendant Jose H. Villarreal ("Villarreal") has been a director of Wal-Mart since

14  1998, and is Chair of the Compensation, Nominating and Governance Committee, which is

15  charged, among other things, with salary and benefits issues for the Company, the Company's

16  reputation, and corporate governance issues. Villareal, along with Rob Walton, is charged with

17  investigating and responding to shareholder communications with the Board, including the

18  demands made by Plaintiff. Villarreal was hand-picked to this position by the Waltons and, in

19  exchange for his fidelity, has been rewarded with hundreds of thousands in fees, compensation,

20  stock and other consideration. He is neither independent nor disinterested in the wrongdoing

21  alleged, nor in the decision to reject plaintiff's demand to bring suit.

22      24.     By reason of their corporate positions and their ability to control Wal-Mart's

23  business and affairs, Defendants owed Wal-Mart fiduciary obligations of care, good faith,

24  honesty and loyalty, and were required to use their utmost ability to control Wal-Mart in a fair,

25  just and equitable manner, as well as to act in furtherance of the best interests of Wal-Mart and

26  not in furtherance of their own personal interests or contrary to law. In addition, each director

27  owed Wal-Mart, while he/she occupied a position on the Wal-Mart Board, the fiduciary duty to

28  exercise good faith, due care and diligence in the management and administration of the affairs of

1  Wal-Mart and in the use and preservation of its property and assets, including taking all
2  necessary steps to cause Wal-Mart to comply with the laws of the United States and the states
3  within which it operates. In violation of their fiduciary duties of care, good faith, honesty and
4  loyalty, Defendants caused, and remainder of the Board allowed Defendants to cause, Wal-Mart
5  to conduct its business in an imprudent and illegal manner by pursuing the unlawful business,
6  civil rights, employment, labor and other practices detailed in this Complaint.

7      25.    Defendants, in breach of their duty of good faith, consciously permitted or failed
8  to prevent Wal-Mart from engaging in a systematic pattern and practice of violating civil rights,
9  employment, discrimination and labor laws, requiring massive expenditures of money, time and
10 effort to investigate and remedy such violations, and exposing the Company to billions in
11 potential damages while forcing it to incur tens of millions more in attorneys' fees, and expert
12 and other litigation and/or investigation costs and expenses.

13     26.    Defendants, and each of them, are sued as participants and as aiders and abettors
14 herein alleged. At all relevant times, each Defendant was and is the agent of each of the
15 remaining Defendants, and in doing the acts alleged herein, was acting within the course and
16 scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the
17 Defendants. There is a unity of interest and ownership between the Defendants listed above,
18 such that the acts of the one are for the benefit and can be imputed as the acts of the other.

19 **D.    Unnamed Participants**

20     27.    Numerous individuals and entities participated actively during the course of and in
21 furtherance of the wrongdoing described herein. The individuals and entities acted in concert by
22 joint ventures and by acting as agents for principals, in order to advance the objectives of the
23 scheme and to provide the scheme to benefit defendants and themselves to the detriment of Wal-
24 Mart.

25     28.    M. Michele Bums ("Bums") has been a director of Wal-Mart since 2003. Bums
26 was hand-picked to this position by the Waltons and, in exchange for her fidelity, has been
27 awarded with at least $339,604 in fees, compensation, stock and other consideration. She is

28
⊕
LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

1  neither independent nor disinterested in the wrongdoing alleged, nor in the decision to reject
2  plaintiff's demand to bring suit.

3      29.    Douglas N. Daft ("Daft") has been a director of Wal-Mart since January 6, 2005.
4  Daft was hand-picked to this position by the Waltons and, in exchange for his fidelity, has been
5  rewarded with at least $140,000 in fees, compensation, stock and other consideration. He is
6  neither independent nor disinterested in the wrongdoing alleged, nor in the decision to reject
7  plaintiff's demand to bring suit.

8      30.    John D. Opie ("Opie") has been a director of Wal-Mart since 2003. Opie was
9  hand-picked to this position by the Waltons and, in exchange for his fidelity, Opie has been
10  awarded with at least $339,604 in fees, compensation, stock and other consideration. He is
11  neither independent nor disinterested in the wrongdoing alleged, nor in the decision to reject
12  plaintiff's demand to bring suit.

13      31.    J. Paul Reason ("Reason") has been a director of Wal-Mart since 2001. Reason
14  was hand-picked to this position by the Waltons and, in exchange for his fidelity, has been
15  rewarded with at least $450,307 in fees, compensation, stock and other consideration. In
16  addition, Reason has pocketed hundreds of thousands of dollars more via sweetheart related-
17  party transactions with the Company. He is neither independent nor disinterested in the
18  wrongdoing alleged, nor in the decision to reject plaintiff's demand to bring suit.

19      32.    Christopher J. Williams ("Williams") has been a director of Wal-Mart since 2004.
20  Williams was hand-picked to this position by the Waltons and, in exchange for his fidelity, has
21  been rewarded with at least $174,991 in fees, compensation, stock and other consideration.
22  Williams' firm, The Williams Capital Group, provided investment services to Wal-Mart in fiscal
23  2005. He is neither independent nor disinterested in the wrongdoing alleged, nor in the decision
24  to reject plaintiff's demand to bring suit.

25      33.    Linda S. Wolf ("Wolf") has been a director of Wal-Mart since June 3, 2005. Wolf
26  was hand-picked to this position by the Waltons and, in exchange for her fidelity, has been
27  rewarded with at least $140,000 in fees, compensation, stock and other consideration. She is

28

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

1  neither independent nor disinterested in the wrongdoing alleged, nor in the decision to reject
2  plaintiff's demand to bring suit.

3      34.    John T. Chambers ("Chambers") was a director of Wal-Mart from 2000 to mid-
4  2003. Chambers was hand-picked to this position by the Waltons and, in exchange for his
5  fidelity, was rewarded with at least $440,207 in fees, compensation, stock and other
6  consideration. He is neither independent nor disinterested in the wrongdoing alleged.

7      35.    Stephen Friedman ("Friedman") was a director of Wal-Mart from 1996 to mid-
8  2003. Friedman was hand-picked to this position by the Waltons and, in exchange for his
9  fidelity, was rewarded with at least $558,686 in fees, compensation, stock and other
10  consideration. In addition, Friedman and his family have pocketed millions more via sweetheart
11  related-party transactions with the Company. He is neither independent nor disinterested in the
12  wrongdoing alleged.

13      36.    Stanley C. Gault ("Gault") was a director of Wal-Mart from 1996 to
14  mid-2004. Gault was hand-picked to this position by the Waltons and, in exchange for his
15  fidelity, was rewarded with at least $570,686 in fees, compensation, stock and other
16  consideration. He is neither independent nor disinterested in the wrongdoing alleged.

17      37.    Dawn G. Lepore ("Lepore") was a director of Wal-Mart from 2001-2004. Lepore
18  was hand-picked to this position by the Waltons and, in exchange for her fidelity, was rewarded
19  with at least $390,307 in fees, compensation, stock and other consideration. She is neither
20  independent nor disinterested in the wrongdoing alleged.

21      38.    Elizabeth A. Sanders ("Sanders") was a director of Wal-Mart from 1992 to mid-
22  2003. Sanders was hand-picked to this position by the Waltons and, in exchange for her fidelity
23  has been rewarded with at least $561,686 in fees, compensation, stock and other consideration.
24  She is neither independent nor disinterested in the wrongdoing alleged.

25      39.    Thomas M. Coughlin ("Coughlin") was an officer and director of Wal-Mart for
26  many years and a colleague of the Company's founder, Sam Walton. In exchange for his fidelity,
27  he has been rewarded with many millions of dollars of direct and indirect compensation.
28  Coughlin served as Vice President of Human Resources. In 1995, he was promoted to Chief

1  Operating Officer.  Coughlin later served as President and Chief Executive of the Wal-Mart
2  Stores Division and Sam's Club, USA.  In January 2005, Coughlin retired from his management
3  positions, amidst allegations that he had embezzled money from Wal-Mart.  Despite such
4  allegations, Coughlin remained as Vice Chairman of Wal-Mart's Board, finally resigning as a
5  director in March 2005.  In 2006, he pled guilty to looting the Company's assets.  On information
6  and belief, the Board released him from claims that the Company had against him.

7  **E.     Doe Allegations**

8           40.     Except as described herein, Plaintiff is ignorant of the true names of defendants
9  sued as Does 1 through 50, inclusive, and, therefore, Plaintiff sues these defendants by such
10  fictitious names.  Following further investigation and discovery, Plaintiff will seek leave of this
11  Court to amend this Complaint to allege their true names and capacities when ascertained. These
12  fictitiously named defendants may be the Company's officers, other members of management,
13  employees and/or consultants who were involved in the wrongdoing detailed herein. These
14  defendants aided and abetted, and not participated with and/or conspired with the named
15  defendants in the wrongful acts and course of conduct or otherwise caused the damages and
16  injuries claimed herein and are responsible in some manner for the acts, occurrences and events
17  alleged in this Complaint.

18                                            **IV.**

19                                **STATEMENT OF FACTS**

20  **A.     The Rise of Wal-Mart**

21           41.     Sam Walton founded Wal-Mart in 1962.  By 1991, Wal-Mart had become one of
22  the largest retailers in the United States.  Sam Walton died in 1992.  After his death, his son,
23  defendant R. Walton, took over as Chairman of the Board of Directors, and his other sons, John
24  T. Walton and (later) Jim C. Walton, joined the Board of Directors to represent and protect the
25  family's interests.  By late 1999, the Company had expanded to over 3,600 stores and 450 SAM'S
26  Clubs in the United States and over 1,000 stores internationally in such places as Argentina,
27  Brazil, Canada, China, Germany, Japan, Mexico and the United Kingdom.

28

1    42.    Today, Wal-Mart is the world's largest retailer and the nation's largest private

2  employer with more than 1.6 million employees.  Wal-Mart has more people in uniform than the

3  United State Army.  Wal-Mart's annual sales account for more than 2% of America's Gross

4  Domestic Product and exceed the entire economic production of 161 countries, including

5  Finland, Greece, Portugal, Ireland New Zealand and Israel.

6    43.    The Walton family's control of Wal-Mart has generated extraordinary wealth for

7  the Walton family.  The members of the Walton family control approximately 38% of the

8  common stock which gives them effective control of the Board and the Company. With an

9  estimated net worth of $20.5 billion each, or $102.5 billion in the family, they rank as five of the

10  ten wealthiest people in America.  In 2003, *Fortune* dubbed Wal-Mart the world's most powerful

11  corporation.  But it has achieved that wealth and power by consistently trampling on the legal

12  rights of its employees and by defying the laws of the United States and the states it does

13  business in, all of which has subjected the Company to massive damages and the risks described

14  herein.

15  **B.    Wal-Mart's Discrimination Against Female Employees**

16    44.    With Defendants at the helm, Wal-Mart's has developed a reputation that it will

17  not follow the laws that other corporations are required to, and do, obey.  Defendants' reckless

18  disregard for their own fiduciary obligations has created a culture of lawlessness within Wal-

19  Mart.

20    45.    The most blatant example of such illegal conduct is Defendants' conscious

21  decision to permit the Company to discriminate against female employees in promotion and pay,

22  and subjecting those who complain to discipline or termination.

23    46.    As widely reported in the national media, Wal-Mart is now being sued for sex

24  discrimination in the *Dukes* case in this Court.  The plaintiffs, who seek to represent more than

25  1.5 million current and former Wal-Mart employees, allege that the Company systematically

26  discriminates against female employees in making promotions, job assignments, pay decisions

27  and training, and retaliates against women who complain against such practices.

28

1    47.     Sworn declarations in the *Dukes* case from more than 100 current and former

2  Wal-Mart female employees – from hourly employees to former district managers – highlight

3  discriminatory practices at Wal-Mart, including:

4               a.     A female assistant manager in Utah was told by her store manager that

5                      retail is tough" and "not appropriate" for women;

6               b.     Managers repeatedly informed women employees that men "need to be

7                      paid more than women because they have families to support";

8               c.     A South Carolina male manager told a woman worker that "God made

9                      Adam first, so women would always be second to men";

10              d.     An Arizona female manager was told she got paid less than a less qualified

11                     man because she "didn't have the right equipment";

12              e.     A Florida female personnel manager was informed by her manager that

13                     men were paid more than women because "men are here to make a career

14                     and women aren't. Retail is for housewives who just need to earn extra

15                     money";

16              f.     A California SAM'S Club manager told another woman she should "doll-

17                     up" to get promoted.

18       48.     Other testimony and documents cited by plaintiffs reveal that senior Wal-Mart

19  managers used and endorsed the use of demeaning stereotypes of women in the work place,

20  including requiring female managers to go to strip clubs and Hooters sports bars for meetings and

21  office outings, and senior managers regularly referring to women employees as "Little Janie Qs"

22  and "girls," despite objections from a woman executive.

23       49.     The evidence plaintiffs in *Dukes* presented in connection with certification of the

24  Class therein, including a detailed statistical analysis of Wal-Mart's own workforce data,

25  demonstrate that the Company's pay and promotion policies systematically discriminate against

26  women.  More particularly, plaintiffs therein presented evidence showing that, since at least

27  1997, female Wal-Mart employees have been paid less than comparable male employees in every

28  year and in every Wal-Mart region despite having, on average, higher performance ratings and

1  more seniority. Instead of improving, this pay disparity has steadily widened over the last five
2  years.

3      50.      According to the *Dukes* plaintiffs, the evidence also shows that Wal-Mart's
4  female employees receive far fewer promotions to management than do their male counterparts,
5  and those women who are promoted wait longer than their male counterparts. Plaintiffs therein
6  explain that although the vast majority of Wal-Mart managers are drawn from the ranks of hourly
7  employees, and over two-thirds of hourly employees are women, women receive only one-third
8  of all promotions to management. Plaintiffs contend that this pattern of under-promotion has
9  been true since at least 1997 and occurs in every region in which Wal-Mart operates, a track
10  record entirely anomalous in the retail industry, where women typically hold over 50% of
11  management jobs. Indeed, Wal-Mart's own internal documents admit that "we are far behind the
12  rest of the world," according to plaintiffs' class certification brief.

13      51.      The *Dukes* plaintiffs' statistical analysis of Wal-Mart's own workforce data reveals
14  than men in every job category are paid more than women, with average annual pay of $105,682
15  for male store managers, $16,402 more than average female store managers, with the pay gap
16  widening higher up the management ladder. At the Senior Vice President level, the average man
17  makes $419,435 a year , while the four women in the position averaged $279,772.

18      52.      In addition, Wal-Mart promotion data shows that women comprise 66% of Wal-
19  Mart's hourly employees, but only 33% of the salaried managers, and just 14% of the store
20  managers. Less than one-third of overall store management is female – a percentage far lower
21  than the 56% of female managers employed by Wal-Mart's competitors, and lower even than the
22  percentage of female manager employed by its competitors in 1975, more than thirty years ago.

23      53.      The shortfalls in female earnings, pay rates, and promotions have a high degree of
24  statistical significance. The *Dukes* plaintiffs' experts, including Dr. Richard Drogin, Emeritus
25  Professor of Statistics at California State University, Hayward, analyzed Wal-Mart's work force
26  data. He found that women earned less than men holding the same job, for nearly all jobs, in
27  every year since 1996. For management employees, the gender pay gap was $14,500. Dr.
28  Drogin's expert report further concluded that:

⊕
LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

a.  Women are disproportionately employed in lower paying hourly jobs. In each of the 41 regions at Wal-Mart, at year-end 2001, the percentage of women hourly employees was approximately twice the percentage of women salaried employees.

b.  In 2001, among full-time employees working at least 45 weeks, male total earnings were about $5,000 more than female earnings, and in each of the 41 regions, men earned at least $2,200 more than women, and in 35 of the 41 regions men earned at least $4,000 more than women.

c.  On average, in 2001, in 76% of the jobs with over 1,000 employees, for employees who were employed for at least 1 year, women had lower hourly pay rates than men working in the same job.

d.  For 97% of jobs with at least 1,000 employees in 2001, women have been working at Wal-Mat longer than men in the same jobs both salaried and hourly.

e.  For 75% of hourly jobs with at least 1,000 employees in 2001, women have higher average performance ratings than men in the same job.

f.  Among men and women hired in hourly positions with over 1,000 hires in 1996, and still employed at year-end 2001, the hourly pay rate for men is $1.16 more than for women, and the average hourly pay rate for men is higher than the rate for women in 80% of the hourly jobs.

59.  As to discriminatory disparities in promotions between men and women into specific jobs at Wal-Mart, Dr. Drogin concluded that:

a.  Women received 2,891 fewer promotions into Support Manager than would be expected from their representation in the feeder pools.

b.  Women received 2,952 fewer promotions into Management Trainee than would be expected from their representation in the feeder pools.

c.  Women received 346 fewer promotions into Co-Manager than would be expected from their representation in the feeder pools.

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

|   |   |   |
|---|---|---|
| 1 | d. | Women received 155 fewer promotions into Store Manager than would be |
| 2 |    | expected from their representation in the feeder pools. |

Regarding discrimination in pay, Dr. Drogin concluded that:

a. Total earnings paid to women range between 5% and 15% less than total earnings paid to similarly situated men in each year, 1996-2001, even accounting for factors such as seniority, status and store.

b. In 2001, when performance ratings were available, the shortfall in earnings for female hourly employees was greater when including performance ratings as a possible explanatory factor for earnings differences than when it was not included.

c. Among hourly employees, women were paid between 18 and 14 cents per hour less than similarly situated men during 1996-2001, even when accounting for factors such as seniority, status, and store. The shortfall in female hourly pay rates became steadily worse from 1997 to 2001.

d. In 2001, when performance ratings were available, the shortfall in hourly rates paid to female hourly employees was greater when including performance ratings as a possible explanatory factor for earnings differences than when it was not included.

e. Women had lower total earnings and lower hourly rates than similarly situated men in each and every one of the 41 regions across the country.

54. A second expert retained by the *Dukes* plaintiffs, Marc Bendick, Jr., Ph.D., reached conclusions similar to Dr. Drogin's. Dr. Bendick, whom the plaintiffs asked to analyze the employment and advancement of women, especially in-store management employees, concluded that women employees lagged behind their male Wal-Mart counterparts by a statistically significant margin. Specifically, he concluded that:

a. The representation of women among in-store managers in Wal-Mart is substantially smaller than would be expected based on the availability of qualified, interested women in the local labor markets in which Wal-Mart


LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

1  operates stores, as measured by the utilization of women in-store managers

2  by large retail chains widely recognized as comparable to Wal-Mart.

3  b.  In 1999, a conservative estimate of the extent of this shortfall is 4,004

4  female in-store managers.

5  c.  Reasonable alternative estimates of this shortfall in 1999 include: 6,445

6  female in-store managers (based on the same method as the conservative

7  estimate but excluding Wal-Mart self in setting the benchmark), 4,911

8  female in-store managers (based on benchmarking Wal-Mart's

9  managerial/non-managerial employee ratios), and 4,328 (based on

10  comparing Wal-Mart to the two competing chains most closely matching it

11  in terms of managers per store).

12  d.  When conservatively updated to 2002, the conservatively estimated

13  shortfall of 4,004 women in-store managers increases to 5,465.

14  e.  Because the rate at which competing firms employ women in-store

15  managers takes account of the rate at which women are available,

16  interested, and qualified to hold in-store management positions

17  comparable to those at Wal-Mart, the causes of Wal-Mart's shortfall are

18  likely to be found in how Wal-Mart hires, trains, selects, assigns, treats,

19  promotes, or retains women employees, not lack of interested, qualified

20  women candidates.

21  f.  Wal-Mart's shortfalls are not simply artifacts of differences between Wal-

22  Mart and its competitors in how they classify and report in-store

23  managerial employees. To the extent these differences exist, they are not

24  sufficiently widespread to invalidate the benchmarking performed or to

25  justify an alternative benchmarking procedure in which Wal-Mart would

26  broaden its counts of in-store managers.

27  g.  The estimated shortfalls are "statistically significant" and cannot

28  reasonably be attributed to chance alone. The conservatively estimated

1    shortfall of 4,004 corresponds to 47.0 standard deviations, representing a
2    probability that a figure this large could have been estimated by chance of
3    less than one chance in many billions.

4    h.    Shortfalls of women among Wal-Mart's in-store managers are pervasive
5          amoung Wal-Mart retail establishments, appearing in approximately four
6          out of five of the firm's stores.

7    i.    Shortfalls of women in Wal-Mart's in-store management occur nationwide.
8          They are found in virtually every state in the nation, in every region, and in
9          both urban and non-urban areas.

10   j.    Women are also substantially under-represented among managers
11         throughout Wal-Mart's non-retail establishments, including corporate
12         headquarters, "white collar" facilities, and "blue collar" facilities such as
13         distribution centers.

14   k.    Substantial shortfalls of women among Wal-Mart's in-store managers were
15         present in every year between 1975 and 1999, and are likely to have
16         persisted from 1999 through 2002.

17   l.    Throughout its history, Wal-Mart has maintained a degree of centralization
18         of its managerial staff at corporate headquarters that is strikingly higher
19         than its comparator firms.

20   m.    The scale, pervasiveness, persistence, and consistency of under-
21         representation of women among Wal-Mart's managers suggests that such
22         under-representation is deeply rooted in the organization's corporate
23         culture and the company-wide employment attitudes, policies and
24         practices that reflect and maintain that culture.

25   A July 21, 2003 *Fortune* magazine article asks: "How can [Wal-Mart] reconcile its storied
26   culture with the anger of these female workers?" Based on the evidence submitted above, the
27   short answer is that it cannot.

28

⊕
LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

1    ## C.    Wal-Mart's Pattern and Practice of Willfully Violating Employment Laws

2        55.    Defendants admit that, were plaintiffs in *Dukes* to prevail, the Company's business
3    and earnings could be adversely impacted. However, regardless of the ultimate outcome, the
4    Company has already sustained enormous injury to its business operations, public image,
5    reputation and goodwill. The public views Wal-Mart as a renegade corporation that considers
6    itself above the laws that apply to everyone else. Indeed, Defendants' violation of their fiduciary
7    duties with respect to their conscious indifference to the Company's widespread discriminatory
8    practices is not isolated to its female employees. To the contrary, there is a clear pattern and
9    practice of other unlawful conducted permitted by Defendants with respect to Wal-Mart's
10   employment practices.

11       56.    While Wal-Mart is the nation's largest company and largest private employer, the
12   Company reportedly pays wages much lower than other large retailers. While most estimates
13   place national median annual income around $44,400, the average hourly worker at Wal-Mart
14   earns about $17,114 a year. Nearly half of Wal-Mart's employees earn less than the federal
15   government's poverty-level for a family of four – approximately $19,350 per year.

16       57.    According to The *Wall Street Journal,* Wal-Mart leads the pack among large
17   corporations that do not provide adequate and affordable worker healthcare insurance. Nearly
18   700,000 Wal-Mart employees are forced to get health benefits from either the government, social
19   welfare or a spouse's plan, allowing the Defendants to shift Wal-Mart's healthcare insurance costs
20   to taxpayers and other employers. In 2004, in California alone, Wal-Mart reportedly shifted about
21   $32 million in healthcare costs to the state. As one Wal-Mart employee puts it: "They're on top of
22   the *Fortune 500,* and I can't get health care insurance for my kid."

23       58.    As a result, the Company has been exposed to repeated lawsuits and other claims
24   by employees to recover healthcare benefits. For instance, Wal-Mart has been named a defendant
25   in a large and expensive class action alleging that Wal-Mart discriminates against female
26   employees by excluding contraceptive coverage from its healthcare plan, although many states
27   already have laws requiring contraceptive coverage. That case, filed in Atlanta federal court,

28

⊕
LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

SHAREHOLDERS' DERIVATIVE COMPLAINT                                        19

1 seeks reimbursement to all employees who paid for their own prescription contraceptives during
2 the past several years.

3    59.    To minimize operating costs and maintain low prices, at Defendants' direction, the
4 Company is alleged to employ vendors who use sweatshop labor overseas to produce goods for
5 sale at Wal-Mart stores under such All-American themes as "Faded Glory." By paying low
6 wages to its clothing suppliers' employees, Wal-Mart can profit greatly while still offering low
7 prices to its customers. However, such goods are manufactured under conditions violative of
8 human rights law, Wal-Mart's own code of conduct and California laws proscribing unlawful
9 business practices. Wal-Mart's claim of "Always Low Prices" relies in part upon exploitation of
10 Third World workers.

11    60.    Under Defendants' stewardship, Wal-Mart has also consistently committed wage
12 and hour violations to keep costs low. On information and belief, in over 30 states, class actions
13 have been filed accusing Wal-Mart of forcing employees to work overtime without pay in direct
14 violation of state and federal law, including the Fair Labor Standards Act. According to press
15 reports, the California Department of Labor Standards and Enforcement reviewed Wal-Mart's
16 compliance or refusal to comply with meal break requirements. Under California law, workers
17 who do not receive a half-hour meal break during an 8-hour shift are entitled to an extra hour of
18 pay.

19    61.    These California claims are in addition to the funds Wal-Mart has been forced to
20 spend to resolve other overtime class and mass action claims. In December 2002, a federal jury
21 in Portland found Wal-Mart liable for forcing 400 employees at 18 Oregon stores to work
22 overtime without pay. On December 22, 2005, a California jury awarded $172 million in
23 compensatory and punitive damages to thousands of California employees at Wal-Mart who
24 claimed they were illegally denied lunch breaks. The verdict is the largest penalty of its kind.
25 During discovery, the employees' lawyers obtained internal audits they claimed showed that Wal-
26 Mart's senior management knew the Company was not granting meal breaks on thousands of
27 occasions. In 2000, Wal-Mart had to settle a similar off-the-clock lawsuit in Colorado, reportedly
28 for a $50 million payment to 69,000 Wal-Mart hourly employees. In May 2003, the Company

1 tentatively agreed to pay hundreds of pharmacists nearly $50 million in damages for failing to
2 pay them overtime compensation.

3     62.    Wal-Mart still faces costly and expensive class action overtime actions on behalf
4 of current and former Wal-Mart employees. On November 3, 2003, a Minnesota court certified a
5 class of more than 65,000 current and former Wal-Mart employees, alleging that Wal-Mart
6 routinely forced workers to skip meals and rest breaks and to work extra hours without pay. The
7 judge noted evidence that Wal-Mart systematically shortchanged its employees, revealed by the
8 Company's own internal audits, and that employees were routinely denied meal and rest breaks.

9     63.    On information and belief, the EEOC has also sued Wal-Mart for failing to
10 comply with the Americans with Disabilities Act ("ADA). As a top EEOC lawyer told *Business*
11 *Week* in an interview about Wal-Mart's failure to comply with the ADA: "I have never seen this
12 kind of blatant disregard for the law." The State of Washington's Department of Labor and
13 Industries, in an unprecedented move, has sought to take over Wal-Mart's workers' compensation
14 program as a result of the Company's practice of delaying payments to injured employees,
15 underpaying wages and benefits, and allowing its outstanding workers' compensation claims to
16 balloon up to 300. Similarly, the EEOC has filed more disability discrimination cases against
17 Wal-Mart than any other corporation.

18     64.    On October 23, 2003, Wal-Mart's credibility and public image took another
19 hit when federal agents arrested undocumented immigrant workers employed on contract
20 cleaning crews at 58 Wal-Mart stores in 21 states. Federal authorities also reportedly seized
21 documents from Wal-Mart's corporate headquarters. In a November 5. 2003 *New York Times*
22 article, law enforcement officials reportedly stated that "Wal-Mart executives must have known
23 about the immigration violations because federal agents rounded up 102 illegal immigrant
24 janitors at Wal-Mart in 1998 and 2001." Another federal official quoted in an October 30, 2003
25 *Associated Press* article stated that conversations recorded at Wal-Mart's headquarters
26 established that "various immigration violations have continued to occur for several years with
27 the direct knowledge and reckless disregard of these violations by the Wal-Mart Corp."

28

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

1  65.  On or about November 4, 2003, Wal-Mart reportedly received a "target letter"
2 from the United States Attorney in Williamsport, Pennsylvania, saying that Wal-Mart had
3 violated the immigration laws.  Target letters give people and companies formal notification that
4 they are the focus of an investigation.  An employer can face civil and criminal penalties for
5 knowingly hiring illegal immigrants or failing to comply with certain employee record keeping
6 regulations. A grand jury reportedly began hearing evidence in the Wal-Mart immigration case in
7 mid-December 2003.  In March 2005, Wal-Mart paid $11 million to settle the federal
8 government's investigation into the Company's undocumented immigrant hiring practices.

9  66.  In the face of such widespread abuse of employment laws, Defendants have
10 chosen and condoned abusive litigation tactics over remedying the underlying wrongdoing.  On
11 information and belief, the Company has been sanctioned over 100 times for engaging in abusive
12 discovery, improper litigation tactics or disobeying court orders.  These court imposed sanctions
13 are a direct result of the culture of disdain or legal accountability that exists within Wal-Mart's
14 management due to the Defendants' disregard for their own fiduciary obligations to the
15 Company.

16 **D.  Injury and Damage to Wal-Mart**

17  67.  Defendants' practice of causing Wal-Mart to consistently violate state and federal
18 employment discrimination laws has badly damaged the Company's public image, reputation and
19 goodwill by exposing it to negative publicity and criticism and costing it millions to try to repair.
20 Defendants have caused the Company to expend funds on public relations to conceal their and
21 the Company's reprehensible practices as described herein.  Business commentators agree that all
22 the bad press surrounding Wal-Mart's treatment of employees "is simply not good for the bottom
23 line in the long term."

24  68.  Defendants' failure to properly oversee, control and govern Wal-Mart's business
25 and affairs with respect to its discriminatory practices against women has placed the Company at
26 the center of a negative publicity firestorm and punitive legislation efforts.  In newspapers and
27 television programs across the nation, Wal-Mart is repeatedly labeled as a renegade company.
28 Wal-Mart is under attack for practices that are destroying lives and ripping apart the fabric of

1 communities and neighborhoods. Public interest groups and local elected officials are joining
2 forces and successfully enacting anti-Wal-Mart location zoning ordinances designed to keep
3 Wal-Mart Supercenters and SAM'S Clubs out of their neighborhoods.

4      69.    Defendants' actions and inactions were and/or are harming Wal-Mart's business in
5 other important ways. For instance, in recent elections, public outrage over the way the
6 Defendants have caused Wal-Mart to conduct its business, including its discriminatory acts
7 against women, has resulted in local communities (Inglewood, California, Hercules, California,
8 and Chicago, Illinois) blocking the building of Wal-Mart stores in their communities, harming
9 Wal-Mart's expansion plans. Many localities, including Oakland, California, have passed
10 legislation preventing Wal-Mart from building "Super Stores" in their communities.

11      70.    Wal-Mart's national press coverage is, put simply, devastating. The public widely
12 perceives that the Company compensates its employees badly, discriminates against women,
13 forces employees to work overtime for no pay to keep their jobs, and conducts its affairs as if the
14 corporation is above the law. Headlines are repeatedly strewn across the nation, stating:

15     "Is Wal-Mart Hostile to Women?: Female workers paint a picture of a harsh, sexist
16 culture," *Business Week,* July 16, 2001.

17     "Wal-Mart values: selling women short," *The Nation,* December 16, 2002

18     "Wal-Mart Is Subject of State Labor Probe," *Los Angeles Times,* June 10, 2003

19     "Judge Rules Against Wal-Mart on Refusal to Talk to Workers," *The New York*
20 *Times* June 19,2003.

21     "Women v. Wal-Mart: How can the retailer reconcile its storied culture with the anger of
22 the female workers," *Fortune,* July 21, 2003.

23     "Wal-Mart Cost-Cutting Finds a Big Target in Health Benefits," *The Wall Street*
24 *Journal,* September 30,2003.

25     "Wal-Mart Raids By U.S. Aimed At Illegal Aliens," *The New York Times,*
26 October 24, 2003.

27     "Illegally in U.S., and Never a Day Off at Wal-Mart," *The New York Times*
28 November 5,2003.

1    "Wal-Mart Draws Grand Jury Focus - Presence of Illegal Workers With Cleaning

2    Contractors Sparks the Federal Probe," *The Wall Street Journal,* November 5, 2003.

3    71.    This repeated criticism of Wal-Mart's discriminatory practices has damaged Wal-
4    Mart's corporate image and reputation and, thereby, Wal-Mart's goodwill. In the long-term, it has
5    damaged Wal-Mart's bottom line, as demonstrated by the Company's steadily declining same
6    store sales and stock price.

7    72.    Defendants are cognizant of the Company's reputation for violating employment,
8    human rights, and other employment laws. They also know that customers, communities,
9    investors and suppliers resent the Company for engaging in heavy handed policies and practices
10    that skirt the spirit of, if not outright violate, the laws. Indeed, the Board commissioned a public
11    relations study performed by Fleishman-Hillard to assess how bad Wal-Mart's reputation had
12    become and the resulting injury to its goodwill and reputation. That study, presented to the Wal-
13    Mart Board in August 2002, confirmed that many view Wal-Mart as a purveyor of cheap goods
14    that routinely engages in "suspect" employment practices. A 2005 report to the Wal-Mart Board
15    reportedly echoed these findings, stating that wages and benefits and healthcare are among the
16    most pressing reputation issues harming Wal-Mart's business.

17    73.    To repair this negative image, Wal-Mart has had and will have to continue
18    spending hundreds of millions of dollars on an image improvement campaign, such as using
19    lobbyists and paid "fronts" to try to convince investors, legislators and consumers that Wal-Mart
20    is a good, fair, law-abiding company. As part of the Company's image improvement campaign,
21    Defendants have reportedly sought to hire a "global ethics director" through the executive search
22    firm, Martha Montag Brown & Associates of Pasadena.

23    74.    Notwithstanding the large profits that Wal-Mart earns, the damage to its business
24    operations, corporate reputation, image and goodwill from Defendants' conduct have caused its
25    stock to be a poor performer, absolutely and relatively. Between 2000 and 2006, Wal-Mart stock
26    has fallen from as high as nearly $70 per share to the mid-$40 – a loss of over $100 billion in
27    market value – trading for the most part between $46-$62 per share. Even more telling is Wal-
28    Mart's relative underperformance compared to the stocks of similar companies.

1    75.    There can be no dispute that this systemic policy and practice of discrimination
2  and violation of employment laws is well known to and authorized by Wal-Mart's management
3  and Board, including Defendants. As the court found in *Dukes*, the Wal-Mart Home Office in
4  Arkansas exercised considerable control and management over the local and regional operations.
5  This culture and policy of oversight was within the supervision and direction of the Board, and
6  extended beyond hiring, promotion and pay discrimination decisions to centralized control of the
7  local physical facilities from the Home Office.

8    76.    Defendants' failure to ensure Wal-Mart's compliance with applicable anti-
9  discrimination laws has exposed and will continue to expose the Company to enormous damages.
10 Despite the risk posed to the Company by the culture of lawlessness that pervades Wal-Mart's
11 management and supervisory ranks, its Board of Directors and management has not taken
12 adequate action or meaningful steps to remedy this conduct and has taken no action to recover for
13 the damages caused to Wal-Mart. Their conscious decisions, coupled with their own disdain and
14 reckless disregard for their fiduciary obligations, are actionable. By this action, plaintiff seeks to
15 remedy the Defendants' misconduct and the Board's failure to act.

16                                            **V.**

17                              **DEMAND REQUIREMENT**

18   77.    Plaintiff brings this action derivatively in the right of and for the benefit of
19 Wal-Mart to redress injuries suffered and to be suffered by Wal-Mart as a result of the
20 Defendants' breaches of fiduciary duty, abuse of control, and gross mismanagement. Plaintiff
21 and her counsel will adequately and fairly represent the interests of Wal-Mart in enforcing and
22 prosecuting its rights.

23   78.    On June 30, 2004, Plaintiff made a written demand upon the Wal-Mart Board to
24 commence action against the persons responsible for the damages and injuries caused to Wal-
25 Mart by the unlawful acts and omissions detailed in this Complaint. A true and correct copy of
26 the demand is attached as Exhibit A. Rather than act on the demand, the Board notified Plaintiff
27 that the demand decision would be deferred until the next regularly scheduled board meeting,

28

⊛
LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

1 during which time, the Wal-Mart Board's practices and policies continued and irreparably
2 damage the Company's public image.

3      79.    Plaintiff was then notified that the written demand was referred to the Audit
4 Committee, which made a recommendation to the Board. However, after more months of delay,
5 on November 22, 2004, the Board, through its counsel, informed Plaintiff that it would not act on
6 the June 30, 2004 demand letter and would await a decision "until resolution of the *Dukes*"
7 litigation. Notwithstanding the fact that the circumstances described herein have only
8 deteriorated since plaintiff made her demands on the Board, and the demand relates to unfair and
9 and illegal practices beyond those described in *Dukes*, the members thereof have not acted on her
10 demands. As such, her demands are deemed refused.

11      80.    In any event, based upon Defendants' acts and omissions in direct violation of
12 their fiduciary duties of care, good faith, honesty and loyalty, a pre-suit demand on the Wal-Mart
13 Board to bring the claims asserted in this action is excused under Rule 23.1 of the Federal Rules
14 of Civil Procedure as a futile and useless act, which it was shown to be by the Board's inaction.

15      81.    The Board's failure to act on Plaintiff's demand, and its implicit rejection of
16 Plaintiff's demand, was not the subject of reasonable business judgement nor in the best interests
17 of the Company. Instead, the demand was wrongfully refused, in bad faith and in an uninformed
18 manner, without adequate investigation and analysis.

19      82.    Furthermore, despite the Board's actual knowledge of the claims asserted by
20 Plaintiff since at least 2001 when the Board reported the financial impact of adjudicated claims
21 against the Company, the Board has failed to seek to recover on behalf of Wal-Mart for any of
22 the wrongdoing alleged. There is no rational business purpose for the Board's failure to take any
23 action on behalf of the Company for such a long period of time.

24      83.    Moreover, the Board lacked independence and impartiality to fairly consider the
25 demand since the entire Wal-Mart Board either participated in or approved the wrongful acts and
26 omissions or recklessly disregarded the wrongs which are complained of herein or benefitted
27 from the compensation received during the time the conduct took place. This is especially true
28 for directors who joined the Wal-Mart Board with full knowledge of the Company's alleged

1  pattern and practice of discrimination against female employees in promotions. Yet, rather than
2  cause Wal-Mart to investigate and take action against the directors and executives responsible for
3  Wal-Mart's policy of gender discrimination as described herein, they consciously failed to act in
4  exchange for their appointments to the Wal-Mart Board and the power, prestige and perquisites
5  resulting therefrom.

6  84.    Defendants Rob Walton and Jim Walton and their family who control over 1.7
7  billion shares of Wal-Mart's common stock, have the power, and have exercised the same, to pick
8  all of Wal-Mart's directors over the past 20 years. Based on such influence, and the substantial
9  compensation they receive from the Waltons through Wal-Mart, the remaining members of the
10  Wal-Mart Board wrongfully rejected demands to sue them and others close to them. Between
11  2000 and 2005, Wal-Mart's directors and top officers pocketed hundreds of millions of dollars in
12  salaries, bonuses and directors fees, as well as hundreds of millions in proceeds from their sales
13  of Wal-Mart stock, further enriching themselves at the expense of the Company to which they
14  owed fiduciary duties of good faith, honesty and loyalty. Thus, the Board could not and did not
15  exercise independent objective judgment in deciding whether to bring this action nor in
16  vigorously prosecuting the claims alleged herein.

17  85.    The directors of Wal-Mart did not, and cannot be relied upon to, reach a truly
18  independent decision whether to commence the demanded action against themselves and the
19  officers responsible for the misconduct alleged in this Complaint because, among other things,
20  the Board is currently dominated by the Defendants on the Board, who were personally and
21  directly involved in the acts of mismanagement, abuse of control and unjust enrichment alleged
22  and who each approved the actions complained of, and to whose directives and views the Board
23  has consistently acceded and will continue to accede. This domination of the Board's ability to
24  validly exercise its business judgment rendered it incapable of reaching an independent decision
25  whether to accept any demand by plaintiff to address the wrongs detailed herein, as exemplified
26  by their inaction in the almost two years since she made her demands..

27  86.    The Board members have close personal and business ties with the Walton family
28  and are, consequently, interested parties who did not and cannot in good faith exercise

❀
LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

1 independent business judgment to determine whether to bring this action against themselves or
2 any other Board member.

3      87.    Wal-Mart's directors and officers are protected against personal liability by a
4 large directors' and officers' liability policy. They caused the Company to purchase that
5 insurance for their own protection with corporate funds, *i.e.,* monies belonging to Wal-Mart.
6 However, the directors' and officers' liability insurance policy covering the Defendants contains
7 provisions which eliminate coverage for any action brought directly by Wal-Mart against these
8 Defendants, known as, among other things, the "insured-versus-insured exclusion." As a result,
9 if these directors were to cause the Company to sue themselves, insurance protection may not be
10 provided for the claims now being asserted derivatively by the plaintiff. This is a further reason
11 why the Wal-Mart Board will not bring such a suit, for to do so would expose themselves, their
12 colleagues and/or friends to a multimillion dollar judgment that would have to be paid from their
13 individual assets alone. On the other hand, if the claims are brought derivatively, as they now
14 have been, such insurance coverage will provide additional and substantial assets for the
15 Company to recover.

16      88.    The demand was also refused because a majority of the directors received
17 personal and financial benefits while they caused or permitted the Company to engage in the
18 extensive misconduct detailed in this Complaint. The Waltons pocketed millions of dollars as a
19 result of their domination and control of Wal-Mart's business and affairs and therefore failed to
20 consider any demand that plaintiff made upon the Wal-Mart Board to commence litigation
21 against them. Similarly, the non-Walton directors have pocketed over $120,000 per year, in cash
22 and stock, for each year of their service to the Waltons on the Wal-Mart Board, in addition to
23 whatever other perquisites and emoluments of office they received, and failed to independently
24 consider plaintiff's demand in deference to their loyalty to the Waltons.

25      89.    The directors are also close friends and business allies. Defendant Glass worked
26 side-by-side with the late Sam Walton for many years during the 1970s and 1980s. After Sam
27 Walton's death, he continued to school Walton's sons in the ways of Wal-Mart's business and
28 affairs. Glass is like an uncle to R. Walton and J. Walton, and did not not fairly evaluate

⊛
LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

1  plaintiff's demand upon the Company to sue the Waltons, nor did the Waltons permit any other
2  director to fairly consider a demand for Wal-Mart to sue Glass, whom the Waltons regard as a
3  family member and loyal lieutenant to their deceased father, Sam Walton. Glass likewise
4  rejected plaintiff's demand to sue the Waltons for misconduct alleged herein because it would
5  jeopardize his own continuing receipt of millions of dollars in compensation and other
6  perquisites from Wal-Mart, as well as that of his son who received over $8.1 million between
7  2002 and 2004 from Wal-Mart as the owner of Springdale Card and Comic Wholesale. This
8  compensation would be placed in immediate jeopardy if Glass fairly considered a demand that
9  Wal-Mart sue the Waltons and/or the other directors responsible for the misconduct detailed in
10  this complaint.

11      90.      Defendant Glass has been on Wal-Mart's Board since January 2000 after serving
12  as President and Chief Executive Officer for 12 years. Glass received millions of dollars from
13  Wal-Mart while the lawlessness particularized in this complaint occurred. From 1997 to 1999,
14  Glass served as trustee and director of Wal-Mart Real Estate Business Trust and is still listed as
15  Trustee on numerous real property filings. In 2000, Wal-Mart purchased two buildings for
16  $500,000 from Glass's company, G&S Partnership. From at least 1996 to 2000, Glass served as
17  a director of Bank of Bentonville, now known as Arvest Bank, a subsidiary of Arvest Bank
18  Group. The Walton family owns over 25% of the capital stock of Arvest Bank Group, where Jim
19  Walton is Chairman and CEO. Arvest Bank has subsidiary banks and ATMs at dozens of Wal-
20  Mart superstores. In 2003, Arvest Bank and its affiliates paid Wal-Mart $528,294 in rent and
21  ATM surcharge payments. In 1998 and 1999, while Glass served as director of both Wal-Mart
22  and the Bank of Bentonville, Glass's G&S Partnership and the bank entered into at least two real
23  estate transactions.

24      91.      Between 1995 and 2000, director Opie was Vice Chairman and CEO of the
25  General Electric Co. Opie has been a member of Wal-Mart's Board since August 2003. In 2004,
26  GE Consumer Finance launched a private label credit card agreement and pilot dual card product
27  with Wal-Mart's UK subsidiary, ASDA. Since 1999, Opie has served on the Board of Delphi
28  Corp. where he has received over $1 million in cash compensation and stock options worth

1 approximately $500,000. Delphi subsidiaries, Delphi Products & Services Solutions and Delphi
2 Electronics Systems, are Wal-Mart suppliers of satellite radio receivers and related items.
3 According to a June 2004 article, Wal-Mart makes up roughly 3% of Delphi Product & Service
4 Solutions' sales in consumer electronics. As one of Wal-Mart's 100 largest suppliers, in August
5 2004, Delphi joined Wal-Mart's pilot program to introduce radio-frequency identification
6 ("WID") to Wal-Mart's supply chain. Opie could not and did not fairly, independently and
7 properly consider plaintiff's demands and wrongfully rejected them because it would jeopardize
8 Delphi's business relationship with Wal-Mart, Opie's director compensation from Delphi, as well
9 as the value of Opie's options in Delphi's common stock. According to Form 4 filings with the
10 SEC, Opie owns approximately $1 million worth of Delphi common stock. From July 2000 to
11 April 2004, Opie also served as a director for The Stanley Works, a member of the S&P 500
12 Index which manufactures tools hardware and door products, a Wal-Mart supplier since 1998.
13 According to a press release issued by Wal-Mart on January 25, 2001, Stanley Works and Wal-
14 Mart entered into a strategic business alliance that expanded Wal-Mart's offerings of Stanley tool
15 and tool box products whereby Wal-Mart agreed to feature Stanley hand tools and discontinue
16 sales of its private-label brand tools.

17     92.     Defendant Hernandez has been a director at Wal-Mart since 1998. Hernandez
18 beneficially owns more than 10% of Inter-Con Security Systems, Inc., to which Wal-Mart paid
19 $731,006 for security services during fiscal 2005. Hernandez also is Chair of the Audit
20 Committee which is charged with ensuring compliance with employment laws.

21     93.     Defendant Scott has been a Wal-Mart director since 1999, serving as a member of
22 the Executive and Stock Options committees. Between 2000 and 2005, Scott received incentive
23 payments exceeding $33.8 million from Wal-Mart. Since 1999, Scott has been a director at
24 Cooper Industries, a Wal-Mart supplier of tools and lighting sold at SAM'S Club and Wal-Mart
25 stores.

26     94.     Defendant Villarreal has been a director at Wal-Mart since 1998, and is Chair of
27 the Compensation, Nominating and Governance Committee, which is charged, among other
28 things, with salary and benefits issues for the Company, the Company's reputation, and corporate

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

governance issues. Villareal, along with Rob Walton, is charged with investigating and responding to shareholder communications with the Board, including the demands made by Plaintiff. Since 1994, Villarreal has been a Partner in the law firm of Akin, Gump, Strauss, Hauer & Feld, LLP, which has rendered legal services to Wal-Mart and members of the Wal-Mart Family and has been integrally involved in the practices and corporate policies described herein. Villarreal likewise will not sue the Waltons for any of the misconduct alleged herein because it would jeopardize Akin, Gump's relationship with Wal-Mart and the continuing receipt of millions of dollars in compensation for legal services.

95. Defendant Breyer has been a director at Wal-Mart since 2001, and is the Chair of the Strategic Planning and Finance Committee charged with strategic planning for Wal-Mart and financial matters. Defendant Breyer beneficially owns more than 10% of Groove Networks, Inc., to which Wal-Mart paid $278,003 for computer software and services during fiscal 2005.

96. Williams has been a director of Wal-Mart since June 2004, and serves on the Audit Committee. Williams was hand-picked to this position by the Waltons. His firm, The Williams Capital Group, has provided investment services to Wal-Mart for which it was paid more than $103,000 in fiscal 2005.

97. Daft and Wolf have been directors of Wal-Mart since early 2005. Despite the abundance of publicly available information, as well as internal Wal-Mart reports, concerning the company's policy of discrimination against female employees, neither has caused Wal-Mart either to investigate the alleged wrongdoing or take legal action against the directors and executives responsible for the unlawful acts. Instead, Daft and Wolf received appointments to the Wal-Mart Board and all of the lavish perquisites and power resulting therefrom.

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY

98.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

99.    Defendants, as Wal-Mart's directors and officers, were and are required to use their abilities to control and manage Wal-Mart in a fair, just and equitable manner in order to ensure that the Company complied with applicable anti-discrimination laws, to refrain from abusing their positions of control, and not to favor their own interests at the expense of Wal-Mart.  Defendants violated their fiduciary duties to Wal-Mart, including without limitation their duties of care, good faith, honesty and loyalty.

100.    The wrongful conduct particularized herein was not due to an honest error in judgment, but rather to Defendants' gross mismanagement, bad faith and/or reckless disregard of the rights and interests of Wal-Mart and its employees, including its female employees, and without reasonable and ordinary care which they owed to Wal-Mart.

101.    As a result of the foregoing, Defendants have participated in harming Wal-Mart and have breached fiduciary duties owed to Wal-Mart.  Defendants knowingly aided, encouraged, cooperated and/or participated in, and substantially assisted the other defendants in the breaches of their fiduciary duties.

102.    By reason of the foregoing, Wal-Mart has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

103.    The acts of Defendants named herein, and each of them, were done maliciously, oppressively, and with intent to defraud; and plaintiff on behalf of Wal-Mart is entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

⊛
LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

1

## SECOND CAUSE OF ACTION

2

## ABUSE OF CONTROL

3      104.    Plaintiff incorporates by reference the allegations set forth above as though fully

4    restated herein.

5      105.    By virtue of their positions and financial holdings in Wal-Mart, defendants

6    exercised control over Wal-Mart and its operations, and owed duties as controlling persons to

7    Wal-Mart not to use their positions of control within the Company for their own personal

8    interests and contrary to the interest of Wal-Mart.

9      106.    Defendants' conduct amounts to an abuse of their control of Wal-Mart, in

10   violation of their obligations to Wal-Mart. Defendants knowingly aided, encouraged, cooperated

11   and/or participated in, and substantially assisted the other defendants in their abuse of control.

12     107.    As a result of Defendants' abuse of control, Wal-Mart has sustained and will

13   continue to sustain damages and injuries for which it has no adequate remedy at law.

14     108.    The acts of Defendants named herein, and each of them, were done maliciously,

15   oppressively, and with intent to defraud; and plaintiff on behalf of Wal-Mart is entitled to

16   punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

17

## THIRD CAUSE OF ACTION

18

## UNJUST ENRICHMENT

19     109.    Plaintiff incorporates by reference the allegations set forth above as though fully

20   restated herein.

21     110.    Defendants derived compensation, fees and other benefits from Wal-Mart and

22   were otherwise unjustly enriched for their management of Wal-Mart during the time in which the

23   wrongful practices occurred, to the detriment of Wal-Mart.

24     111.    Defendants' enrichment is directly and causally related to the detriment of Wal-

25   Mart.

26     112.    The benefit was accepted by Defendants under such circumstances that it would

27   be inequitable for it to be retained without payment. As alleged above, Defendants breached

28

❀
LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

1  their fiduciary duties and/or abused their positions of control to Wal-Mart and therefore

2  Defendants are not justified to retain the benefits conferred upon them.

3  **VII.**

4  **PRAYER FOR RELIEF**

5  WHEREFORE, Plaintiff, on behalf of Wal-Mart, prays for judgment as follows:

6  1.   Awarding damages against all Defendants, jointly and severally, in an amount to

7  be proven at trial;

8  2.   Awarding restitution, disgorgement of all illicit proceeds generated as a result of

9  the wrongful conduct alleged herein, and punitive damages;

10  3.   Awarding appropriate equitable relief;

11  4.   Awarding pre-judgment interest, as well as reasonable attorneys' fees and other

12  costs;

13  5.   Awarding such other relief as this Court may deem just and proper.

14  **VIII.**

15  **JURY TRIAL DEMAND**

16  Plaintiff, pursuant to Federal Rule of Civil Procedure 38, demands a trial by jury of all

17  issues which are subject to adjudication by a trier of fact.

18  Dated: June 1, 2006                    COTCHETT, PITRE, SIMON & McCARTHY

19

20

21                                          By: _____
22                                               MARK C. MOLUMPHY (168009)
                                                 COTCHETT, PITRE, SIMON & McCARTHY
23                                               San Francisco Airport Office Center
                                                 840 Malcolm Road, Suite 200
24                                               Burlingame, CA 94010
                                                 Phone: (650) 697-6000
25                                               Fax: (650) 697-0577
                                                 mmolumphy@cpsmlaw.com

26                                          *Attorneys for Plaintiff M.J. Furman,*
                                            *derivatively on behalf of Wal-Mart Stores, Inc.*
27

28

# GREENFIELD & GOODMAN LLC
## ATTORNEYS AT LAW
24579 Deep Neck Road
Royal Oak, MD 21662
Facsimile: (410) 745-4158

Richard D. Greenfield
*Also Admitted to the New York*
*and Pennsylvania Bars*

e-mail: whitehatrdg@earthlink.net

June 30, 2004

Board of Directors
Wal-Mart Stores, Inc.
702 Southwest 8th Street
Bentonville, AR 72716-0215

**VIA CERTIFIED MAIL**

Dear Directors:

I am writing to you on behalf of Martha J. Furman, a shareholder of the Company currently and at all relevant times.

As you know, Federal Judge Martin Jenkins has, in <u>Dukes v. Wal-Mart</u>, certified a Class of 1.6 million current and former Wal-Mart female employees in an employment discrimination class action.

Based upon the record to date in this litigation and the facts as they were presented to and found as facts by Judge Jenkins, women working in Wal-Mart Stores have been and are paid less than male employees throughout the country, pay disparities exist in most job categories and there is otherwise rampant discrimination against female employees, all of which is in violation of, among other laws, federal civil rights laws.

Similarly, as you also know, the Company has been named as a defendant in various class actions in which plaintiffs have made claims under the Fair Labor Standards Act and certain state laws because the Company has forced employees to work "off the clock" and failed to provide work breaks. As well, labor-related claims are the subject of other class actions and the Company's employment practices are being investigated by the California Department of Labor Standards Enforcement.

These class actions and others are disclosed in the Company's Annual Report to shareholders and Form 10-K Annual Report. Notwithstanding management's "boilerplate" disclosures therein that such litigation "may result in liability material to the Company's financial condition or results of operations" and "the Company has made accruals with respect to these lawsuits [those disclosed by name], where appropriate, which are reflected in the Company's consolidated financial statements," management has concealed material facts known to them which would reveal Wal-Mart's true exposure from such litigation and that the "accruals" are materially deficient

As a result of such misrepresentations and concealment of material facts, the Company has been caused to violate the disclosure requirements of the federal securities laws and subjected it to claims by investors who have been damaged thereby.

Because the damage to the Company is likely to be in the many hundreds of millions of dollars or more as a result of the actions of the Board and senior management and the damage to its reputation incalculable, I hereby demand on behalf of my client that the Company commence legal proceedings against each of the officers of the Company and each of you that have been responsible for this long-prevailing pattern of discrimination and the other violations of law referred to above. To the extent that the Company's lawyers and auditors have assisted in carrying out these practices, I demand that they be sued as well.

In making this demand, I do not acknowledge that any of you are independent or are capable of fairly and objectively acting upon this demand. Nevertheless, this demand is being sent to you in the probability that if shareholder derivative litigation is commenced, your counsel would argue that the failure to have made a demand somehow was required under the circumstances. While I recognize that this demand is futile, it is being made for the very narrow purpose set forth above.

To facilitate your response to this letter, I have attached a redacted portion of my client's brokerage statement from Legg Mason showing her current ownership of 1,600 shares of Wal-Mart common stock.

I look forward to your prompt response.

Sincerely yours,

Richard D. Greenfield

RDG/slp
Enclosure
cc: Ms. Martha J. Furman: fmaggie252@aol.com
C:\My Files\Legal Docs\Walmart BD of DIR demand 6-30-04.doc

2